# EXHIBIT A

**COMMONWEALTH OF MASSACHUSETTS**

| | |
|---|---|
| **NORFOLK, SS** | **SUPERIOR COURT**<br>**CIVIL ACTION NO.** |

STEVEN POGODA,
   Plaintiff,

v.

MASSACHUSETTS HOUSING FINANCE AGENCY,
   Defendant.

## COMPLAINT & JURY DEMAND

## PARTIES

1. The Plaintiff, Steven Pogoda ("Mr. Pogoda" or "Plaintiff"), is an individual residing at 176 Presidents Lane, Apt. 411, Quincy, MA, Norfolk County, Massachusetts 02169.

2. The Defendant, Massachusetts Housing Finance Agency ("MassHousing" the "Agency" or "Defendant"), is a quasi-public agency with a principal place of business at 1 Beacon Street, Boston, Suffolk County, Massachusetts 02108-3110.

## GENERAL ALLEGATIONS

3. Mr. Pogoda is legally blind and therefore qualifies as a disabled individual entitled to reasonable accommodations and a work environment free of discrimination.

1

4. Mr. Pogoda, a Financial Accountant, has been a valuable employee at MassHousing for approximately nineteen (19) years.

5. He impressed management immediately with one of his first responsibilities which was to reconcile non-cash accounts comparing the balances of the internal accounting system (CODA), the internal investment system (PAM), and the Trustee bank statements. He set up a spreadsheet to put all of the data into separate tables and set up Vlookup and Hlookup formulas to pull the data into the spreadsheet to reconcile the accounts. Using his methodology and logic, the head of System and Technology had his group create a CODA match tool which MassHousing has continued to use to reconcile all of the accounts.

6. Also early on, Mr. Pogoda familiarized himself with the financial modeling software called DBC which no one at MassHousing knew how to use. He started to run cash flow analyses for the CFO in regards to the $420,000,000 SHARP refunder the Agency was undertaking. The CFO was very impressed with his work, and had him sit in on meetings with rating agencies, had him present to the Board of Directors, and told the then Controller, Al Hoban, to give him a 7% raise. However, six (6) months later, Mr. Hoban had still had not told Human Resources to give him the raise. Eventually, Tim Sullivan had to do it himself, but it was not retroactive.

7. But later, when Mr. Sullivan asked Mr. Pogoda for a cash flow run he had done, because of his visual impairment he accidentally emailed Mr. Sullivan the wrong file. After Mr. Sullivan looked foolish when he passed the file along without looking at it, he never asked Mr. Pogoda for anything again. Eventually, Mr. Sullivan could no longer remain as CFO because during the meltdown of Lehman Brothers, he improperly sent them a $4,700,000 check as pre-payments on swaps.

8. Another example of Mr. Pogoda's impressive record at MassHousing was when the Agency started entering into interest rate swaps during his first year there. Mr. Pogoda, who was the only person in his group who had experience with such swaps,

helped create a swap tracking tool, which calculates the monthly swap payments based on the weekly variable rates. As the Agency entered into more swaps, Mr. Pogoda created an entire workbook to track all of them and to provide quarterly aggregate numbers. The results of the spreadsheets and tables this workbook creates are placed into the public financials each year.

9. Mr. Pogoda's employment at MassHousing took a downturn when he started to report to Dave Pottier, who was in charge of the annual budget, but whose main personal priority unfortunately was state politics and running for state senator -- he even had a campaign poster on the door to his office. Whenever Mr. Pogoda went to Mr. Pottier to ask a question or discuss how to address an issue, Mr. Pottier would not even look up from his telephone. Mr. Pottier was consistently abusive toward Mr. Pogoda, and on or about July 17, 2014 even threatened to fire Mr. Pogoda because he accurately pointed out that Mr. Pottier was not reading Mr. Pogoda's emails.

10. In or around 2011, when the man in charge of reviewing all of the arbitrage calculations left the Agency, Mr. Pogoda was asked to take on the arbitrage review as an additional responsibility. However, he received no raise or other additional compensation for these duties. Conversely, if he ever makes a small mistake or needs a couple extra days to complete these tasks while tending to his other responsibilities, MassHousing is quick to criticize and penalize him.

11. The average salary of an arbitrage compliance specialist is about $83,000. The average MassHousing salary is about $95,000. Mr. Pogoda's salary is only in the mid $70,000s.

12. The Agency's unfair treatment of Mr. Pogoda came to a head in November of 2015, when he wrote a letter appealing an unfairly and illegally low salary increase of 2.5%. In his appeal letter, Mr. Pogoda noted, inter alia, that: (1) Marcia Zosack falsely told him that such a small increase was in line with a good performance review; (2) she inappropriately raised the issue of his vision in the context of a performance review and

merit increase; (3) no one had ever expressed to him any unhappiness with his work; and (4) the abuse and inept practices of Mr. Pottier.

13. At that time, in his appeal letter and orally, Mr. Pogoda also complained about the improper conduct by certain executives and how MassHousing overlooked and even rewarded such misconduct.

14. MassHousing has unfairly and unlawfully punished Mr. Pogoda ever since, both for asserting his rights and for blowing the whistle about the improper conduct by certain executives and how MassHousing overlooked and even rewarded such misconduct.

15. Because of that appeal letter, MassHousing has retaliated and discriminated against Mr. Pogoda ever since. After reading it, Mr. Pottier gave Mr. Pogoda a nasty look and never spoke to him again. He also slammed the door to his office, which was very close to Mr. Pogoda's desk, every time he went in. A few months later, Mr. Pottier got into trouble when he presented a budget that was a complete mess, but the Agency just gave him busywork to do until he was able to use his state political connections to secure the CFO job at the Department of Transportation.

16. Mr. Pogoda's later manager, Financial Reporting Manager Belmira Fallon, has also retaliated and discriminated against him, including by unfairly rating Mr. Pogoda's performance poorly and denying him merit increases. Ms. Fallon is angry because Mr. Pogoda told the truth about Ms. Fallon's friend, Mr. Pottier, who had to leave MassHousing when he got caught shirking his duties.

17. Since his appeal letter, Mr. Pogoda has not received any merit increases. Every small mistake is magnified, while those around him make much bigger mistakes but are continually rewarded for their work. By way of a few examples, Steven Shankle makes mistakes all of the time. Ricardo Franco makes mistakes every month when he sends out PAM debt. And Stephen Ronayne spends hours walking around the Agency socializing. Yet each of these individuals receives a raise every year.

4

18. In 2018, MassHousing unfairly and illegally gave Mr. Pogoda a very poor performance review and put him on a probationary period of six (6) months. Nevertheless, Mr. Pogoda worked very diligently to improve his performance and made far fewer mistakes, but when he asked William Conroy about his improved performance, he responded that there was no change at all. Mr. Conroy failed to provide any analysis or breakdown of different tasks. His purported assessment, which was no more than an unsupported blanket statement, was inaccurate, unfairly subjective, and discriminatory.

19. MassHousing has also consistently failed to provide adequate and timely accommodations to help Mr. Pogoda with his visual impairment. One example was when he reviewed document magnifiers at the Carroll Center, and then it inexcusably took the Agency almost a year to get the equipment to his desk for his use. Other times, after accommodations were finally made, MassHousing supervisors tried to take credit for doing Mr. Pogoda a favor, as opposed to fulfilling a legally mandated requirement. Myra Carmona even made Mr. Pogoda thank her for approving the last group of equipment.

20. Mr. Pogoda's current supervisor William Conroy continues to harass him over every small mistake. In contrast, whenever Mr. Pogoda points out an error that Mr. Conroy has made, Mr. Conroy tries to pass it off as though he did it intentionally to see if Mr. Pogoda was paying attention.

21. Mr. Pogoda's supervisors have also been repeatedly insensitive to him. While Mr. Pogoda was out with serious personal injuries due to an accident, Mr. Conroy asked if he had tried any new beers at microbreweries lately. Of course, Mr. Pogoda was unable to travel to any breweries or bars, and was on pain killers so that he could not drink alcohol in any event.

22. When the Coronavirus quarantine began in March, Mr. Pogoda expressed anxiety that he was not sure when he would get to see his children again or if was going to be

able to get groceries delivered. Mr. Conroy responded that Tom Brady left the Patriots and these are crazy times. Some weeks ago, Minalyn Ebanculla even sent Mr. Pogoda an email suggesting that he drive to the office, even though she knows full well that he is unable to drive because of his disability.

23. When Mr. Pogoda returned to work in October of 2019 after his accident, Mr. Conroy inappropriately tasked him with scanning four (4) boxes of reconciliations. To make matters worse, Mr. Conroy promised several times that he would assist Mr. Pogoda with the scanning, but then never followed through with any help at all.

24. More recently, in or around August, 2020, Mr. Conroy inappropriately requested that Mr. Pogoda fill out paperwork related to his performance evaluation. As Mr. Pogoda's supervisor for years, Mr. Conroy has to know that Mr. Pogoda's disability prevents him from being able to do so.

25. On November 5, 2020, Mr. Conroy delivered to Mr. Pogoda a perfunctory, inaccurate, unfairly negative performance appraisal, which included a salary increase of merely 1.33% -- not even enough to cover the cost of living increase. The evaluation also confirms that MassHousing has failed to provide adequate and timely accommodations to help Mr. Pogoda with his visual impairment.

26. For several years, he has received no performance raises at all, only cost of living increases if that. At the same time, his coworkers have enjoyed performance raises. Mr. Pogoda himself always received performance raises until he was constrained to issue his 2015 appeal letter.

27. Accordingly, MassHousing's mistreatment of Mr. Pogoda, including illegal discrimination and retaliation, and the maintaining of an unendurably hostile work environment, has been discriminatory and unlawful.

28. The statutes which MassHousing is violating include but are not limited to the Americans with Disabilities Act and the Massachusetts Fair Employment Practices Act.

29. Defendant needlessly and improperly created and continues to foster a hostile work environment.

30. Defendant also has illegally discriminated against him on the basis of his disability, and has failed to provide proper accommodations, both of which violations remain ongoing.

31. MassHousing's many violations of the law are continuing.

32. For example, MassHousing continually repeats its unlawful refusal to grant Mr. Pogoda the performance raise he deserves. And as several recent email exchanges document, MassHousing representatives continually refuse to provide proper accommodations to which he is entitled, and he has to endure continual discriminatory and insensitive behavior and comments from his supervisor.

33. Recently, at a meeting on February 4, 2021 where Mr. Pogoda, a legally blind man, was in attendance, his supervisor William Conroy actually complained that he was "flying blind" because he did not have access to Bloomberg.

34. Yet another example of MassHousing's unlawful mistreatment of Mr. Pogoda took place on February 25, 2021 when his group had a meeting led by Craig Mery, Belmira Fallon, Lisa Silva Levine, and Stephen Vickery (three managers and the comptroller). This meeting was to discuss educational credentials that each of them have and suggest that the people in Mr, Pogoda's group should work towards for advancement in MassHousing. Each person presented their own designation, what the requirements were, and how long you had to take the test(s) to receive the designation. Not one of them mentioned if the study guide were available in any other format or if someone who needed extra time to take the test(s) could be accommodated. About three quarters of the way through the meeting, Mr. Vickery said that an MBA would obviously be a bonus to a MassHousing employee. Mr. Pogoda already has a master's in finance.

7

MassHousing management continually goes out of its way to exclude Mr. Pogoda and to make him feel that he is not part of the team.   MassHousing also continually makes it necessary for Mr. Pogoda to remind it at every turn that he has special needs that should be met seamlessly under the law.

35. On or about November 20, 2020, Plaintiff filed a Complaint with the Massachusetts Commission Against Discrimination ("MCAD") against Defendant.

36. Plaintiff is filing the present case more than ninety (90) days after filing his MCAD case, in which he has filed a Withdrawal.

## Damages

37. Mr. Pogoda's damages total in the hundreds of thousands of dollars and include compensation for the lack of earned merit increases based on his performance, legal fees and the cost of administrative and legal proceedings pursuant to federal and state law, and punitive damages based on the Agency's discriminatory practices with reckless indifference to his federally protected rights.

38. Plaintiff has also suffered and continues to suffer emotional distress, and has incurred physical injuries which he continues to suffer, including but not limited to pain and suffering in addition to emotional damage.   Plaintiff is constantly concerned about whether his unfairly low salary will cover his bills, he has many sleepless nights, and he is forced to withstand a persistent ongoing barrage of insulting comments from his supervisor.

39. This unfair adverse employment action by the Agency has a spiraling effect.   Every year, Mr. Pogoda's base salary becomes exponentially smaller than it should be, as MassHousing repeats its error in depriving him of a performance raise, and his cost of living increase is based on a base salary much smaller than what he deserves.   Even more dramatically, this continuing adverse employment action will have a severe impact on Mr. Pogoda's pension, social security, and his disability if it becomes necessary,

because these benefits, which will last years and maybe decades, will also be based on an unfairly low base salary. The damages over time constitute hundreds of thousands of dollars.

40. Should Mr. Pogoda be terminated, actively or constructively, he would also be entitled to his salary, pension, 457 Plan, vacation days, paid time off, sick leave, health insurance, other benefits, and the cost of replacement health insurance (e.g. COBRA).

## COUNT I
## DISCRIMINATION BASED ON DISABILITY AND
## FAILURE TO PROVIDE PROPER ACCOMMODATIONS

41. Plaintiff hereby incorporates Paragraphs 1 through 40 above.

42. Defendant's misconduct constitutes discrimination based on Plaintiff's disability and failures to provide reasonable accommodations, in violation of federal and state law, including but not limited to the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, the Americans with Disabilities Act, 29 U.S.C. § 12101 *et seq.* ("ADA") and M.G.L. c. 151B.

43. Defendant has conducted itself intentionally, deliberately, willfully, and in callous disregard of Plaintiff's rights.

44. As a direct and proximate result of Defendant's discrimination based on Plaintiff's medical condition and/or disability, Plaintiff has incurred substantial and continuing damages, including but not limited to those damages referenced above in Paragraphs 37 through 40 above.

## COUNT II - RETALIATION

45. Plaintiff hereby incorporates Paragraphs 1 through 44 above.

46. As detailed above, Defendant unlawfully retaliated against Mr. Pogoda for asserting his rights and for blowing the whistle about the improper conduct by certain executives and how MassHousing overlooked and even rewarded such misconduct.

47. Defendant's unlawful retaliation began after it received Mr. Pogoda's appeal letter in November of 2015, and remains ongoing as do the resulting damages.

48. Defendant retaliated against Plaintiff, by, *inter alia*, wrongfully withholding performance raises and promotions that Plaintiff has earned, mistreating him, and creating and maintaining a hostile work environment.

49. Such retaliation constituted a violation of federal and state law, including but not limited to Title VII, ADEA, OWBPA, and M.G.L. c. 151B § 4(4).

50. As a direct and proximate result of the Defendants' retaliation, Plaintiff has incurred substantial and continuing damages, including but not limited to those damages referenced above in Paragraphs 37 through 40 above.

## COUNT III - HOSTILE AND ABUSIVE WORKING ENVIRONMENT

51. Plaintiff hereby incorporates Paragraphs 1 through 50 above.

52. The Defendant's misconduct created a hostile and abusive working environment in violation of federal and state law, including but not limited to Title VII, ADEA, OWBPA, the Rehabilitation Act of 1973, and M.G.L. c. 151B.

53. As a direct and proximate result of Defendant's creation of a hostile and abusive working environment, Plaintiff has incurred substantial and continuing damages, including but not limited to those damages referenced above in Paragraphs 37 through 40 above.

## COUNT IV - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

54. Plaintiff hereby incorporates Paragraphs 1 through 53 above.

55. Defendant's actions have constituted extreme and outrageous conduct.

56. Defendant intended to cause Plaintiff to suffer severe emotional distress, knew or should have known that its conduct would cause Plaintiff to suffer emotional distress, or was reckless as to the effect of its conduct.

57. As a direct and proximate result of Defendant's intentional infliction of emotional distress, Plaintiff has suffered and continues to suffer emotional distress, and has incurred physical injuries which he continues to suffer, including but not limited to pain and suffering in addition to emotional damage.

58. Plaintiff is constantly concerned about whether his unfairly low salary will cover his bills, he has many sleepless nights, and he is forced to withstand a persistent ongoing barrage of insulting comments from his supervisor.

## COUNT V - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

59. Plaintiff hereby incorporates Paragraphs 1 through 58 above.

60. Defendant's actions have constituted extreme and outrageous conduct.

61. Through its extreme and outrageous conduct, Defendant negligently caused Plaintiff to suffer severe emotional distress.

62. As a direct and proximate result of Defendant's negligent infliction of emotional distress, Plaintiff has suffered and continues to suffer emotional distress, and has incurred physical injuries which he continues to suffer, including but not limited to pain and suffering in addition to emotional damage.

63. Plaintiff is constantly concerned about whether his unfairly low salary will cover his bills, he has many sleepless nights, and he is forced to withstand a persistent ongoing barrage of insulting comments from his supervisor.

## COUNT VI - BREACH OF CONTRACT

64. Plaintiff hereby incorporates Paragraphs 1 through 63 above.

65. Defendant's unlawful conduct has included but not been limited to failure to pay Plaintiff the compensation he has earned, discrimination based on Plaintiff's disability, failures to provide reasonable accommodations, retaliation, creating and maintaining a hostile and abusive work environment, intentional infliction of emotional distress, and negligent infliction of emotional distress.

66. Defendant's actions constitute breaches of contract against Plaintiff, including breach of terms arising from the parties' conduct, and breach of terms contained in Defendant's employee handbook(s), manual(s), and/or other employment documents.

67. As a direct and proximate result of Defendant's breaches of contract, Plaintiff has incurred substantial and continuing damages, including but not limited to those damages referenced above in Paragraphs 37 through 40 above.

## COUNT VII - BREACH OF IMPLIED CONTRACT

68. Plaintiff hereby incorporates Paragraphs 1 through 67 above.

69. Plaintiff undertook to work for Defendant in good faith, with a reasonable expectation that Defendant, in exchange, would act in good faith with respect to its obligations as employer and would honor the terms arising from the parties' conduct and the terms contained in Defendant's employee handbook(s), manual(s), and/or other employment documents.

70. Defendant, having reason to believe that Plaintiff was acting on such expectation, permitted Plaintiff to work for Defendant without objection.

71. Therefore, Plaintiff has a contract implied-in-fact with Defendant.

72. Defendant's unlawful actions, including the misconduct recounted above in Paragraph 65 above and as outlined throughout this Complaint, constitute breaches of implied contract against Plaintiff.

73. As a direct and proximate result of Defendant's breaches of implied contract, Plaintiff has incurred substantial and continuing damages, including but not limited to those damages referenced above in Paragraphs 37 through 40 above.

## JURY DEMAND

Plaintiff demands trial by jury on all claims so triable.

**WHEREFORE,** the Plaintiff, Steven Pogoda, hereby respectfully demands:

(1) Judgment against the Defendant, Massachusetts Housing Finance Agency, in an amount to be determined at trial, plus interest, costs, reasonable attorneys' fees, punitive damages, and multiple damages.

(2) Such additional relief as the interests of justice and equity demand.

                         Respectfully submitted,
                         The Plaintiff,
                         Steven Pogoda,
                         By his Attorneys,

Louis Movitz, BBO #564780
lou.movitz@verizon.net
Alan L. Packer, BBO # 386830
PACKER AND MOVITZ, P.C.
27 Mica Lane, Ste. 202
Wellesley, MA 02481-1741
(781) 235-3000

LM\pogoda\complaint

14